## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| PHILIPS MEDICAL SYSTEMS NEDERLAND B.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS INDIA LTD., <br><br>                                   Plaintiffs, <br><br>       v. <br><br> TEC HOLDINGS, INC., F/K/A TRANSTATE EQUIPMENT COMPANY, INC., TRANSTATE EQUIPMENT COMPANY, INC., F/K/A TRANSTATE HOLDINGS, INC.; and ROBERT A. ("ANDY") WHEELER, individually and in his capacity as executor and personal representative of the Estate of DANIEL WHEELER <br><br>                                   Defendants. | Civil Action No. <br> 1:17-cv-02864-LMM <br><br><br> **JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Plaintiffs Philips Medical Systems Nederland B.V., Philips North America LLC, and Philips India Ltd. (collectively, "Philips" or "Plaintiffs"), by and through their undersigned counsel, hereby bring the following Amended Complaint against TEC Holdings, Inc., formerly known as Transtate Equipment Company, Inc. ("Transtate I"), Transtate Equipment Company, Inc., formerly known as Transtate Holdings, Inc. ("Transtate II") (collectively, "Transtate"), and Robert A. ("Andy") Wheeler, individually and in his capacity as executor and personal representative of the Estate of Daniel Wheeler ("the Estate") (Andy Wheeler and the Estate are

US_ACTIVE-147022893

referred to collectively as "the Wheelers"; all defendants are referred to collectively as "Defendants"), and plead as follows:

## Overview

1.    Philips develops, sells, supports, maintains, and services medical imaging systems, such as X-ray systems, used at hospitals and medical centers, including the proprietary hardware and software used to operate, service, and repair such systems.

2.    Transtate I provided and Transtate II provides maintenance and support services for certain of such medical systems.  Several prior employees of Philips North America LLC were previously employed by Transtate I and are currently employed by Transtate II as service specialists, service technicians, or similar positions.

3.    Philips' medical imaging systems include Philips' copyrighted and proprietary intellectual property, and proprietary trade secrets, in the form of, among other things, proprietary software that Philips technicians can use to service the medical imaging systems.  Philips includes proprietary access controls on the medical imaging systems to restrict access to its proprietary software to authorized individuals.

4.    Transtate I has used, and Transtate II continues to use, misappropriated trade secret information from Philips to circumvent the access

Active\95542538.v2-5/23/19

controls on Philips' medical imaging systems to gain unauthorized access to proprietary and copyrighted software.  Transtate I and II have also made unauthorized copies of Philips' standalone service software, circumvented access controls on the standalone software, and made unauthorized use of such software. Transtate I and II have also decrypted and made unauthorized copies of Philips' copyrighted service documentation.  Transtate uses its unauthorized access to and copies of Philips' proprietary software and copyrighted documents to unfairly compete against Philips.

5.     Based upon Transtate's conduct and actions, and the resulting damages suffered by Philips, Philips asserts claims in this Amended Complaint for: violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; violations of the Digital Millennium Copyright Act, 17 U.S.C. § 1201; violations of the Defend Trade Secrets Act, 18 U.S.C.§ 1836; misappropriation of trade secrets and violations of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, *et seq.*; and copyright infringement, 17 U.S.C. § 101, *et seq*.

6.     Philips additionally seeks a permanent injunction preventing Defendants from further improper and unauthorized access to, and use of, Philips' software and other trade secrets.

## Parties

7.     Plaintiff Philips Medical Systems Nederland B.V. is a Netherlands corporation with offices at Veenpluis 4-6, 5684 PC Best.

8.     Plaintiff Philips North America LLC is a Delaware LLC, formerly known and doing business as Philips Electronics North America Corporation (a Delaware Corporation), with a principal place of business in Andover, Massachusetts.

9.     Plaintiff Philips India Ltd., formerly known and doing business as Philips Electronics India Ltd., is a foreign corporation with a principal place of business in Bangalore, India.

10.     The named plaintiffs—Philips—are collectively in the business of developing, manufacturing, selling, supporting, maintaining, and servicing Philips' medical imaging systems, including the proprietary hardware and software and related trade secrets that are necessary—and/or may be used—to operate, service, and repair such systems.

11.     Defendant TEC Holdings, Inc. ("Transtate I") is a North Carolina corporation with its principal place of business in Concord, North Carolina, and was formerly known as Transtate Equipment Company, Inc.  On or about March or April, 2017, Transtate Equipment Company changed its name to TEC Holdings, Inc.  TEC Holdings, Inc. was in the business of providing some maintenance and

- 4 -

support services for certain medical imaging systems that include Philips imaging devices, such as x-ray machines, and other devices used at hospitals and medical centers.

12.     Defendant Transtate Equipment Company, Inc. ("Transtate II"), is a Delaware corporation with its principal place of business in Deerfield, Illinois, and was formerly known as Transtate Holdings, Inc.  On or about April 27, 2017, Transtate Holdings, Inc. changed its name to Transtate Equipment Company, Inc. Transtate Equipment Company, Inc. is in the business of providing some maintenance and support services for certain medical imaging systems that include Philips imaging devices, such as x-ray machines, CT and PET scanners, MR scanners, and nuclear medicine scanners, and other devices used at hospitals and medical centers.

13.     On or about March or April, 2017, Transtate II acquired substantially all of the assets of Transtate I, including its business name and employees, its customer contracts, know-how, policies, processes, practices, and procedures ("the Acquisition").

14.     Daniel Wheeler passed away on March 23, 2019.  Daniel Wheeler was the President of Transtate I until near the time of his passing and was the President of Transtate II until sometime in 2018.  Daniel Wheeler resided in Raleigh, North Carolina.  Upon information and belief, Defendant Robert A.

- 5 -

("Andy") Wheeler is the executor and personal representative of the Estate of Daniel Wheeler.

15.     As the President of both Transtate entities, Daniel Wheeler oversaw Transtate's actions addressed in this complaint, including its use of an exploit method addressed below to gain unauthorized access to Philips Proprietary Service Materials.

16.     Daniel Wheeler or the Estate is an owner of Transtate I.

17.     Andy Wheeler is the Vice-President of Transtate I and took over as the President of Transtate II from Daniel Wheeler sometime in 2018.  Andy Wheeler resides in Concord, North Carolina.

18.     As the Vice-President of Transtate I and President of Transtate II, Andy Wheeler oversaw Transtate's actions addressed in this complaint.

19.     Andy Wheeler is an owner of Transtate I.

20.     Andy Wheeler is an owner of Transtate II.

21.     Andy Wheeler additionally developed one or more of the Exploit Mechanisms addressed below to gain unauthorized access to Philips Proprietary Service Materials.

## Jurisdiction and Venue

22.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) because claims asserted in this case arise

Active\95542538.v2-5/23/19

under:  18 U.S.C. § 1030 (Computer Fraud and Abuse Act); 28 U.S.C. § 1338(a)

(any act of Congress relating to patents, copyrights, and trademarks);

17 U.S.C. § 1201 (Digital Millennium Copyright Act); 18 U.S.C.§ 1836 (Defend

Trade Secrets Act); and 28 U.S.C. § 1369 (supplemental jurisdiction) and the

doctrines of ancillary and pendant jurisdiction.

23.     This Court also has subject-matter jurisdiction over the claims

between Philips and Transtate I and the Wheelers pursuant to 28 U.S.C. § 1332

(diversity) because the amount in controversy exceeds $75,000, exclusive of

interest and costs, and complete diversity exists between the parties.

24.     This Court has personal jurisdiction over Transtate I because

Transtate I engaged in maintenance activities at a Piedmont Healthcare hospital

located in or around Atlanta, Georgia.  In relation to those maintenance activities,

Transtate I used misappropriated trade secret information to intentionally

circumvent system access controls to use Philips' copyrighted and proprietary

service tools to perform the maintenance activities, thus giving rise to the claims

below.

25.     This court has personal jurisdiction over Transtate II because

Transtate II conducts business in Georgia.  This court further has personal

jurisdiction over Transtate II because, on information and belief, Transtate II

engaged in maintenance or service activities at Emory Saint Joseph's Hospital in

Atlanta, Georgia in April 2017.  On information and belief, in relation to those activities Transtate II used misappropriated trade secret information to intentionally circumvent system access controls to use Philips' copyrighted and proprietary service tools to perform the maintenance activities, thus giving rise to the claims below.

26.     This Court also has personal jurisdiction over Transtate I and II under O.C.G.A. § 9-10-91 because Transtate I and II have or continue to transact business in this state; have committed tortious acts or omissions in this state; and/or did or regularly do or solicit business, engage in a persistent course of conduct, or derive substantial revenue from services rendered in this state.

27.     This Court has personal jurisdiction over the Estate and Andy Wheeler because the Wheelers were officers of the Transtate defendants and were primary participants in the activities forming the basis for jurisdiction over the Transtate defendants.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the conduct, events, or omissions giving rise to Philips' claims occurred in this judicial district and/or had and have connections to this judicial district.

**Facts and Allegations**

29.     Philips reasserts, re-alleges, and incorporates by reference the allegations in the above-stated paragraphs of this Second Amended Complaint as if fully set forth herein under Facts and Allegations.

### ~ Background Concerning Philips and Philips' Systems ~

30.     Philips develops, manufactures, and sells—and subsequently supports, maintains, and services—medical imaging systems that are used at hospitals and medical centers ("Systems"), including developing, manufacturing, selling, supporting, maintaining, and servicing the proprietary hardware and software that are necessary—and/or that may be used—to operate, service, and repair the Systems.  The Systems include, but are not limited to, imaging devices such as x-ray machines, CT and PET scanners, MR scanners, and nuclear medicine scanners.

31.     The foregoing Systems include, but are not limited to:  a series of x-ray machines known as the "Allura" models; a series of CT and/or PET scanners known as the "Brilliance," "Ingenuity," "Vereos," "IQon," "iCT," "Big Bore," and "MX16" models; a series of MR scanners known as the "Ingenia" models; and a series of nuclear medicine and/or other scanners known as the "BrightView" models.

- 9 -

32.     The Systems are complex pieces of medical equipment that rely heavily on accompanying proprietary software developed and/or owned by Philips, the specific versions and functionalities of which can vary among Systems.

33.     When Philips sells Systems to a customer, the agreement with the customer permits Philips to deliver to the customer Proprietary Service Materials. The Proprietary Service Materials provide authorized users with proprietary tools that assist with the maintenance and servicing, diagnostic, calibration, and other functionalities of Systems.  The agreement establishes that the presence of Proprietary Service Materials will not give the customer any right or title to such property or any license or other rights to access or use such property.  The agreement further establishes that the customer will use all reasonable efforts to prevent any access or use of such property by any unauthorized party.

34.     In addition to, and separate from, those Proprietary Service Materials, Philips also provides tools to allow performance of assembly, installation, adjustment, and testing ("AIAT") services on Philips Systems.

35.     Philips systems include access controls that provide varying levels of access to users.  Philips provides an AIAT access level to allow customers or third-party service providers of their choosing to access tools to perform AIAT services.

36.     The Proprietary Service Materials allow Philips engineers and employees to provide advanced servicing and configurations beyond AIAT

- 10 -

services.  Philips prohibits non-authorized Philips persons from having access to such proprietary software through contractual agreements with employees and customers.  Philips Systems further include hardware and software access controls to prevent non-authorized Philips persons from having access to such proprietary software.

37.   Certain Proprietary Service Materials require specialized expertise and training to use properly and safely.  Accordingly, Philips' access controls restrict access to certain tools to only highly-trained specialists.  Even Philips Field Service Engineers do not have access to such highly specialized Proprietary Service Materials.

38.   Philips' ability to control access to Philips Proprietary Service Materials—and to grant or deny certain levels of access to non-Philips individuals—is important and valuable to Philips because it provides Philips with a means of protecting its proprietary information and maintenance tools while also protecting the public from potential unnecessary radiation exposure as a result of modification or customization of a System by unauthorized or insufficiently trained users.  The access controls also provide Philips with the ability to provide enhanced maintenance and support services to customers of a type that could not be legitimately provided to those customers by non-Philips individuals.

Active\95542538.v2-5/23/19

**~ Protection of Philips Proprietary Service Materials ~**

39.     Philips takes numerous, active steps to protect and keep confidential its proprietary information, including the Philips Proprietary Service Materials contained on and within the Systems.  Philips Systems include a Field Service Framework that provides access control for such Philips Proprietary Service Materials.

40.     Philips Proprietary Service Materials and Field Service Framework are protected by copyright.

41.     Philips Proprietary Service Materials and Field Service Framework also contain and encompass trade secrets that are of commercial value to Philips and that Philips actively attempts to guard and preserve from disclosure or unauthorized access.

42.     Employees of Philips—including Former Philips Employees hired by Transtate—enter into contractual agreements to preserve and protect against unauthorized use and disclosure of Philips secret, proprietary and confidential information or data.  That information includes information about Philips' Proprietary Software and its access control systems.  Such agreements survive the cessation of each individual's employment with Philips and remain in effect beyond such employment.

- 12 -

43.    Philips Field Service Framework provides multiple levels of access to proprietary software on the Systems.  Certain Philips Systems, including the Allura Systems, utilize an access key dongle ("Access Key")—a device that attaches to a computer port and must be present to run a piece of software—to identify the access level of a user.  When a user attaches his or her Access Key to a System, the Field Service Framework provides the user with access to only the tools and components that they are authorized to access.  The Field Service Framework prohibits non-authorized users from accessing Philips Proprietary Service Materials.

44.    The lowest access level provides some basic access to software tools and does not require an Access Key.

45.    Philips provides non-Philips persons with limited access to perform AIAT services on the Allura Systems.  Philips requires non-Philips persons accessing its software on the Systems to register with Philips for such AIAT access as a means of regulating authorized use and the authorized levels of software access for each user.  For the Allura Systems, once a user registers and Philips authorizes the user for AIAT access, Philips provides the user with an Access Key that the registered user can use to access certain AIAT tools on the Allura System. A Philips Field Service Engineer must program the Field Service Framework on the specific Allura System to accept the non-Philips person's Access Key and

- 13 -

permit access to certain AIAT tools if the Allura System was not pre-programmed to permit access to certain AIAT tools.

46.    Non-Philips persons, including both the purchasers of the System and third-parties hired to maintain the system, have no right to access the Philips Proprietary Service Materials on the Systems unless Philips expressly grants them such right.  Purchasers of the Systems agree that they do not have a right to access or use the Philips Proprietary Software and agree to use reasonable efforts to prevent any access to or use of the Philips Proprietary Software by any unauthorized party.

47.    AIAT access is one of multiple levels of access that exist within the Systems.  Philips may grant certain Philips Field Service Engineers, specialists, developers, and other individuals levels of access higher than AIAT access, which results in those individuals having authorized access to elements and functionalities of the Philips Proprietary Service Materials that are not available to AIAT access users.  Philips Field Service Framework includes access controls that require an authorized user to present an Access Key configured to permit that user to access the higher level functionality.  Such access controls protect the public from potential unnecessary radiation exposure as a result of the use of Philips Proprietary Service Materials by unauthorized or insufficiently trained users.

48.     Additionally, for protection of Philips Proprietary Service Materials, Philips ensures that it retains—and does retain—ownership of its Proprietary Service Materials even though the physical machine upon which Philips Proprietary Service Materials reside may itself be owned by a hospital, medical center, or other Philips customer.

### ~ Background Concerning Transtate~

49.     Purchasers of Philips Systems—such as hospitals and health care providers throughout the United States—may obtain post-warranty maintenance and other servicing for the Systems from Philips or may use independent, non-Philips companies for maintenance and servicing.

50.     Transtate provides competing, non-Philips maintenance and servicing for certain Philips Systems (as well as for various systems of other major manufacturers in the medical field).

51.     Upon information and belief, Transtate I offered and Transtate II offers such services, at least in part, by hiring or employing former Philips employees and by improperly and knowingly using Philips' confidential and proprietary information that those employees learned during the course of their employment with Philips and which was provided to those employees on a confidential basis and as a condition of their employment.

52.     Transtate hired or employs former Philips support specialists, including William Griswold and Dale Dorow, and multiple other former Philips employees (collectively, "Former Philips Employees").

53.     The Former Philips Employees, during the course of their employment with Philips, entered into written agreements with their Philips employer titled "Employee Ethics and Intellectual Property Agreement."

54.     Pursuant to these agreements, the Former Philips Employees agreed not to disclose or use any secret or confidential information relating to the business of Philips that was acquired from any source during their employment at Philips. Philips' Employee Ethics and Intellectual Property Agreements survive termination of Philips' employees, and thus oblige Former Philips Employees not to disclose or use any Philips secret or confidential information either during or after their employment with Philips.

55.     Transtate is not a party to the confidentiality agreements between Former Philips Employees and Philips.

56.     Former Philips Employees' confidentiality agreements with Philips, including the Philips Employee Ethics and Intellectual Property Agreements, provide no benefit to Transtate, and Transtate has no direct interest (economic or otherwise) in such agreements between Former Philips Employees and Philips.

Active\95542538.v2-5/23/19

57.     Former Philips Employees working for Transtate participated in exit interviews with Philips prior to their departure from Philips employment.  During these exit interviews, Former Philips Employees working for Transtate acknowledged their continuing duties of confidentiality and affirmed that they have returned all Philips property upon termination.

## ~ Transtate's Exploit Mechanisms~

58.     Transtate has developed multiple mechanisms (the "Exploit Mechanisms") for exploiting Philips' proprietary service tools, Philips' Proprietary Service Materials, Philips' Field Service Framework, and Philips' copyrighted works including copyrighted documents, software, and log files.

59.     Transtate has developed exploit software (the "software exploit") that modifies files within Philips Systems thereby circumventing access controls, effectively disabling such access controls, and allowing Transtate employees and others to gain access to Philips' trade secrets and copyrighted materials.

60.     The development of this software exploit relied upon unauthorized use of Philips trade secrets obtained from Former Philips Employees, despite those Former Philips Employees' ongoing obligations and unauthorized possession of such material.

61.     Transtate creates USB drives containing Transtate's software exploit and distributes such USB drives to Transtate employees.  Transtate trains its

Active\95542538.v2-5/23/19

employees in how to utilize the USB drives, including the software exploit reproduced thereon, in order to circumvent Philips' access controls.

62.     Transtate has also distributed, and on information and belief continues to distribute, its software exploit to other third parties, and has trained such third parties in use of the software exploit in order to circumvent Philips' access controls and access Philips' Proprietary Service Materials.

63.     Transtate further instructs Transtate's employees, including Former Philips Employees, to make use of the software exploit, derived from unauthorized use of Philips trade secrets, to compete against Philips for the provision of services to Philips Systems by making unauthorized use of Philips' Proprietary Service Materials.

64.     Transtate's use, and Transtate's training of its employees and of third parties to make use of, the software exploit provides Transtate an unfair economic advantage by allowing Transtate to make use of Philips' intellectual property (the object of large financial investments by Philips) at no cost to Transtate.

65.     Specifically Andy Wheeler developed, and Daniel Wheeler encouraged Andy Wheeler's development of, the software exploit.  To do so, Andy Wheeler made unauthorized use of Philips' trade secrets obtained from Former Philips Employees.

Active\95542538.v2-5/23/19

66.     Andy Wheeler, in his capacity as an officer of Transtate, and having an ownership interest therein, directs, and has directed, Transtate employees to make use of the software exploit, and has himself used the software exploit, in order to circumvent Philips' access controls.

67.     Daniel Wheeler, in his prior capacity as an officer of Transtate, and having had an ownership interest in Transtate I, directed Transtate employees to make use of the software exploit in order to circumvent Philips' access controls.

68.     Daniel Wheeler, in his capacity as an officer of Transtate, and having had an ownership interest therein, has directed Transtate employees to conceal, and has himself worked to conceal, Transtate's development and use of the software exploit.

69.     Transtate also deploys and maintains unauthorized copies of Philips' internal stand-alone software tools ("Philips Internal Software") on its company Google drive and on its employees' laptops as a matter of regular course of Transtate's business.

70.     Use of Philips Internal Software deployed on Transtate employees' laptops requires a Philips authorized account and a Philips IST Key.

71.     Transtate's employees do not possess Philips accounts and Philips IST Keys that together are capable of enabling the use of the Philips Internal Software

Active\95542538.v2-5/23/19

that Transtate deploys on Transtate's company Google drive and its employees'

laptops.

72.     Transtate's employees are able to exploit, have exploited, and

continue to exploit Philips Internal Software placed on their Transtate-issued

employee laptops by Transtate, because Transtate has developed or acquired one or

more mechanisms for circumventing the access controls that require a Philips

account and a Philips IST Key in order to make use of Philips Internal Software

(the "circumvention mechanism").  The circumvention mechanism is separate and

apart from the software exploit.

73.     Andy Wheeler, in his capacity as an officer of Transtate, and having

an ownership interest therein, is aware of and has overseen and instructed, and

continues to oversee and instruct, Transtate employees to deploy the Philips

Internal Software on the Transtate Google drive and its employee laptops together

with the Transtate's circumvention mechanism.

74.     Andy Wheeler, in his capacity as an officer of Transtate, and having

an ownership interest therein, is aware of and has overseen, assisted, and

instructed, and continues to oversee, assist, and instruct, Transtate employees' use

of Philips-developed software tools without authorization by circumvention of the

access controls using the circumvention mechanism.

- 20 -

75.     Daniel Wheeler, in his capacity as an officer of Transtate, and having an ownership interest in Transtate I, was aware of and has overseen and instructed, Transtate employees to deploy the Philips-developed software tools on Transtate employee laptops together with the Transtate developed circumvention mechanism.

76.     Daniel Wheeler, in his capacity as an officer of Transtate, and having an ownership interest in Transtate I, was aware of and has overseen and instructed, and continues to oversee and instruct, Transtate employees' use of Philips-developed software tools without authorization by circumvention of the access controls necessary to access and make use the Philips-developed software tools.

77.     Transtate also circumvents Philips' access controls to access without authorization and create unauthorized copies of Philips' copyrighted and proprietary log files on the Allura systems.  Philips' access controls are configured to prevent unauthorized access to Philips' copyrighted and proprietary log files. Transtate has used trade secret information misappropriated from Philips to gain unauthorized access to the log files and create unauthorized copies of the log files.

78.     Transtate also deploys and distributes Transtate software that circumvents Philips' access controls and specifically works to allow third parties to make copies of Philips' copyrighted and proprietary log files (the "log file downloader").

- 21 -

79.     The log file downloader allows third parties to whom Transtate

provides a copy of the log file downloader to access Philips copyrighted log files.

The third parties can then send copies of Philips' copyrighted log files over the

Internet to Transtate employee's remote locations.  To do this, the log file

downloader circumvents Philips access controls to obtain access to log files that

would otherwise be inaccessible to the log file downloader software by virtue of

the access controls.

80.     Dan Wheeler and Andy Wheeler, as officers of Transtate, were aware

of Transtate employee's unauthorized circumvention of Philips' access controls

and to create unauthorized copies of Philips' copyrighted log files and Transtate's

provision of a log file downloader to third parties to enable the third parties to

circumvent Philips' access controls and create unauthorized copies of Philips'

copyrighted log files, and oversaw and directed such activities.

81.     Separate and distinct from the software exploit, the circumvention

mechanism, and the log file downloader, Transtate also obtains encrypted Philips

electronic documents, decrypts those documents, and strips those documents of

their metadata allowing Transtate to redistribute unauthorized unprotected copies

of Philips' electronic documents (the "decryption and stripping mechanism").  By

using the decryption and stripping mechanism, Transtate is able to redistribute

such unauthorized copies of Philips electronic documents.

- 22 -

82.     Philips distributes certain proprietary documents in encrypted form to control access to trade secret and proprietary information expressed in such documents.  Such documents, when distributed by Philips, at least sometimes include metadata that identifies the file author and that the document is from Philips.  Transtate's decryption and stripping mechanism effectively creates an unauthorized digital copy of the Philips distributed document with the metadata, including author and identification that it is from Philips, removed.

83.     Andy Wheeler, in his capacity as an officer of Transtate, and having an ownership interest therein, has overseen, directed, and participated in, and continues to oversee, direct, and participate in, the decryption, unauthorized use, and redistribution of unprotected Philips electronic documents obtained by decrypting encrypted Philips electronic documents and striping the decrypted copies of their metadata.

84.     Daniel Wheeler, in his capacity as an officer of Transtate, and having an ownership interest in Transtate I, has overseen or directed the decryption, unauthorized use, and redistribution of unprotected Philips electronic documents obtained by decrypting encrypted Philips electronic documents and striping the decrypted copies of their metadata.

85.     Thus, Transtate has employed, and both Daniel Wheeler and Andy Wheeler have overseen, directed, or assisted in the use of various Exploit

Active\95542538.v2-5/23/19

Mechanisms, including at least the software exploit, the circumvention mechanism, the log file downloader, and the decryption and stripping mechanism, for circumventing Philips access controls on Philips Proprietary Service Materials and Philips Internal Software to access and make use of Philips proprietary information and copyrighted works without authorization.

### ~ Transtate's Actions Toward Former Philips Employees ~

86.     Transtate actively solicits employment from Former Philips Employees.

87.     Transtate encourages Transtate employees who are Former Philips Employees, once hired, to transfer Philips trade secrets and proprietary tools and information to Transtate.

88.     Shortly after being hired William Griswold, a former Philips national support specialist (*i.e.* a Former Philips Employee), provided Transtate with misappropriated internal Philips documents regarding how to locally and remotely access Philips Systems.

89.     Mr. Griswold also provided Transtate with internal Philips documents describing software Philips uses to gather information and to facilitate multi-user collaboration.  Transtate later came to use this same software to compete against Philips.

90.     Transtate has acquired Philips' secret and proprietary information from Former Philips Employees by inducing them to disclose such secret and proprietary information.  Such proprietary information includes customer locations, customer contact information, confidential passwords, and details of equipment installed for customers.  This information was previously made available to the Former Philips Employees who had entered into confidentiality agreements with Philips.

91.     Transtate has also acquired copies of Philips' internal proprietary stand-alone software programs; software programs that Philips uses only for internal purposes, and which Philips does not distribute outside of Philips.

92.     In their capacity as officers of Transtate, Daniel Wheeler and Andy Wheeler oversaw, encouraged, or instructed Former Philips Employees to share Philips' proprietary information and trade secrets with Transtate.

93.     As to any conduct referred to herein by Transtate or its employees that either Daniel Wheeler or Andy Wheeler did not directly oversee, both Daniel Wheeler and Andy Wheeler have had the ability to oversee such conduct by virtue of their positions as officers of Transtate.

**~ Transtate I's Actions at the Lakewood Regional Medical Center ~**

94.     In or about July 2015, Transtate I committed acts at the Lakewood Regional Medical Center ("Lakewood") in Lakewood, California, that resulted in

- 25 -

Transate I providing maintenance and support services for Lakewood that were achieved only because Transate I unlawfully exceeded its authorized levels of access to Philips' proprietary software on an Allura System, and did so by using misappropriated trade secret information to actively circumvent and bypass access controls in violation of federal and state laws.

95.   Specifically, in or about July 2015, Lakewood purchased a replacement tube for an Allura model x-ray machine from North America Imaging ("NAI").  Upon information and belief, NAI retained Transate I as a subcontractor to perform the x-ray tube installation service for Transate.  Upon information and belief, Transate I misrepresented or implied to NAI that it was authorized to perform the services it performed for Lakewood.

96.   Upon information and belief, on July 30, 2015, a technician from Transate I provided services to Lakewood to replace an x-ray tube on an Allura System.  Upon information and belief, the technician had not registered for AIAT access to the Allura System, and therefore was not authorized to access the System. The technician unlawfully circumvented and bypassed the access controls to gain access to and use the Allura System at Lakewood.

97.   Specifically, upon information and belief, the Transate I employee accessed the Allura System without an Access Key.  The Transate I employee circumvented the access controls to gain access to the USB drive, then used

- 26 -

Transtate's software exploit to create a copy of a software file on the Allura System and modify the software file to alter the access levels required for access to certain Proprietary Service Materials.  By using the software exploit to modify specific portions of the software file in a specific way, the Transtate I employee was able to alter the access controls so that a user accessing the Allura System without an Access Key would be able to access and use Philips Proprietary Service Materials that would otherwise require a specific Access Key to access.

98.     Lakewood was not authorized to access the Philips Proprietary Service Materials and could not have authorized Transtate I to have access to the Philips Proprietary Service Materials.

99.     The Transtate I employee then used the Philips Proprietary Service tools he gained access to by circumventing access controls to perform services for Lakewood.

100.   Upon information and belief, the Transtate I technician used knowledge of trade secrets and other proprietary knowledge that became known to the Former Philips Employees through their former employment with Philips to circumvent access controls on the Allura System.

101.   As a result of Transtate I's actions, Transtate I was able to perform servicing on the Allura System that they were not authorized or granted a license to perform, and that intruded upon Philips' proprietary software and trade secrets, and

that interfered with Philips' business of providing maintenance and support services that cannot be legitimately offered by any non-Philips entity.

**~ Philips' Investigation of the Transtate I Incident at Lakewood~**

102.   A Philips Field Service Engineer ("FSE") was on site at Lakewood on July 30, 2015.  The FSE was providing services on a system in a room adjacent to the room in which an Allura System was located.  The FSE witnessed a technician from a then-unknown third-party perform x-ray tube replacement on the Allura System.

103.   The FSE introduced himself to the unknown third-party technician. The FSE inquired as to whether the technician was just doing a mechanical installation.  The third-party technician stated that he would be doing calibrations and adjustments.  The FSE inquired how the technician could perform those calibrations and the technician responded that he had an Access Key.

104.   The Philips FSE was concerned that the necessary calibrations and adjustments had either not been performed or had not been performed correctly, which could risk patient safety.  The FSE reported his concerns to his Supervisor and to a National Support Specialist ("Specialist").

105.   Philips analyzed the Allura System's log files, which showed that the System had been accessed for calibrations without insertion of an Access Key.

Active\95542538.v2-5/23/19

106.   Philips analyzed files from the Allura System and eventually discovered that changes were made to two files.  The result of these changes effectively removed access controls on the use of Philips Proprietary Service Materials on the Allura System.  The technician's knowledge of the specific files to modify and specific modifications to make to those files to gain unauthorized access to the Philips Proprietary Service Materials indicates a high level of knowledge about Philips' proprietary systems.

107.   Philips learned that Lakewood purchased the tube from NAI.  In August 2016, Philips contacted NAI regarding the unauthorized access to Philips Proprietary Service Materials on the Allura System.  In September 2016, NAI responded by indicating that it did not render any physical servicing of the Allura System in question, and indicating that the provider the Philips FSE observed was most likely an employee of Transtate I.

108.   On September 27, 2016, Philips wrote to Mr. Daniel Wheeler of Transtate I at 1418 Ameron Drive, Charlotte, NC 28206, the address then listed on Transtate's website, demanding that it immediately cease and desist its unauthorized access to Philips Proprietary Service Materials, and demanding that Transtate redress the injury suffered by Philips as a result of Transtate I's conduct.  After receiving no response to its September letter, on November 21, 2016, Philips again wrote to Transtate I demanding that it promptly cease and desist all

unauthorized access to and use of Philips Proprietary Service Materials.  Philips was informed by the Postal Service that the deliveries were not successful for the reason: "No authorized recipient available."

109.   At some point, Transtate I changed its website to list both the Ameron Drive address and a new address of 7089 Weddington Road NW, Concord, NC 28027, and on October 6, 2016, Transtate I changed its registered office to the Weddington Road address.  On December 9, 2016, Philips wrote to Transtate I again, this time to both its Weddington Road and Ameron Drive addresses, reiterating its demands.  Transtate I responded on December 16, 2016, confirming receipt of the letters.

110.   On January 13, 2017, Transtate I responded through counsel. Transtate I did not deny that its employee gained access to the Allura System at Lakewood to perform calibration services without using a requisite Access Key. Transtate I's counsel, however, stated that his investigation revealed no violation of any protectable interest of Philips.

111.   Philips investigated whether other systems had been modified to provide unauthorized access to Transtate I.  Philips' investigation identified many other systems on which, upon information and belief, Transtate I used misappropriated trade secret information to circumvent access controls to gain unauthorized access to Philips Proprietary Service Materials.

- 30 -

### ~ Transtate I's Actions at the Holmes Regional Hospital ~

112.   In or about July, 2016, Transtate I committed acts at the Holmes
Regional Hospital ("Holmes") in Melbourne, Florida, that resulted in Transtate
providing maintenance and support services for Holmes that were achieved only
because Transtate I misappropriated trade secret information to actively
circumvent and bypass Philips' access controls to gain unauthorized access to
Philips' proprietary software.

113.   Specifically, in or about July 2016, a Transtate I technician provided a
maintenance service to an Allura System at Holmes.  On information and belief,
the Transtate I technician circumvented the access controls to gain access to the
USB drive, then used Transtate's software exploit to modify a configuration file on
the Allura System to circumvent access controls and gain unauthorized access to
Philips Proprietary Service Materials.

114.   On information and belief, the Transtate I technician then used Philips
Proprietary Service Materials to provide maintenance services.

115.   On information and belief, Transtate I has circumvented access
controls to gain unauthorized access to Philips Proprietary Service Materials on at
least six Philips Systems at Holmes.

**~ Transtate I's Actions At Piedmont Healthcare ~**

116.   Piedmont Healthcare ("Piedmont") operates an integrated healthcare system including seven hospitals in greater Atlanta, Georgia.

117.   In or around September 2016, Transtate I committed acts at a Piedmont hospital in or around Atlanta, that resulted in Transtate I providing maintenance and support services for Piedmont that were achieved only because Transtate misappropriated trade secret information to actively circumvent and bypass Philips' access controls in violation of federal and state laws to gain unauthorized access to Philips' proprietary software.

118.   Specifically, on information and belief, Transtate I has installed a "black box" connected to at least one Allura System at Piedmont that provides Transtate I with remote access to the Allura System.  Transtate I has modified access controls on the Allura System or otherwise circumvented access controls on the Allura System to gain unauthorized access via the black box.  In relation to that unauthorized access, Transtate I provides services for Piedmont.

119.   In or around September 2016, the services provided by Transtate I to Piedmont included Bill Griswold providing Piedmont with a modified version of a database that controls image quality, radiation dose, and other functions on the Allura Systems.

120.   Philips Internal Software that requires an IST key for authorized access is required to modify the database modified by Bill Griswold.  On information and belief, Transtate I acquired an unauthorized copy of Philips Internal Software and circumvented access controls to the Philips Internal Software to modify the database for Piedmont.

### ~ Transtate I's Actions Nationwide ~

121.   While the conduct set forth above occurred at the Lakewood, Holmes, and Piedmont facilities, upon information and belief Transtate I has engaged in similar improper conduct to gain unauthorized access to Philips Systems at sites they service nationwide, including, by way of example only, sites in at least the following locations: Macon, Georgia; Cumming, Georgia; Austin, Texas; Wake Forest, North Carolina; Greensboro, North Carolina; and Charlotte, North Carolina.

122.   On information and belief, at each location Transtate I used misappropriated trade secret and proprietary information from Former Philips Employees to circumvent the access controls to gain access to the USB drive, then used Transtate's software exploit to modify Philips' proprietary software in order to gain unauthorized access to AIAT tools in lieu of registering for legitimate AIAT access.

123.   Upon information and belief, the Transtate I technicians who gained access to the Philips Systems had not registered with Philips for AIAT access prior to performing service activities.

124.   Upon information and belief, Transtate I's technician's modification of Philips' proprietary software to circumvent access controls also gave the Transtate I technicians unauthorized access to Philips Proprietary Service Materials on Systems that they were not authorized to access.

125.   Access to, and use of, Philips' proprietary data and Philips' trade secrets is of significant commercial value to those that gain improper access to it—like Transtate I—because it permits the entity to improperly modify Philips Systems to circumvent access controls and provide maintenance and support services of a type and/or efficiency that—without their improper access—only Philips' service technicians could perform.  Relatedly, protection of Philips' access control information and other such Philips' proprietary data and Philips' trade secrets is of significant commercial value to Philips with respect to Philips' marketing of support, servicing, and maintenance services to hospitals, medical centers, and other Philips customers.

126.   Upon information and belief, Transtate I's conduct—and the conduct of those working for Transtate I—is not limited in time to the above-identified events and is not limited in geographic location to only the identified sites.  Upon

information and belief, Transtate's conduct is, instead, representative of widespread conduct that continued until, on information and belief, the Acquisition.

127.   In 2013, William Griswold, a Former Philips Employee, provided Andy Wheeler with confidential documents from his employment with Philips. These confidential documents explained how to locally and remotely access Philips Systems.  Andy Wheeler relied on these documents in developing at least the software exploit, one of Transtate's Exploit Mechanisms.

128.   Daniel Wheeler was aware of Transtate's exploit methods and instructed Transtate employees to not talk with any OEM service representatives about Transtate's exploit methods and to prevent or not allow any non-Transtate person to observe the steps Transtate's employees take to access computer maintenance screens.

129.   Andy Wheeler was also aware of Transtate's exploit methods, and actively assisted Transtate employees in the use of Transtate's exploit methods to disable access controls on Philips Systems, thereby allowing Transtate employees to access Philips' proprietary service tools and copyrighted logs.  And Andy Wheeler has actively participated in unauthorized copying of Philips' copyrighted software and log files.

130.   As officers of Transtate I, and having an ownership interest therein, Daniel Wheeler and Andy Wheeler directly participated in Transtate I's conduct— and the conduct of those working for Transtate I—by overseeing, directing, and/or assisting those working for Transtate I in carrying out Transtate I's conduct.

### ~ Transtate II's Actions ~

131.   Like its predecessor, Transtate II continues to provide competing, non-Philips maintenance and servicing for certain Philips Systems (as well as for various systems of other major manufacturers in the medical field).

132.   Because Transtate II effectively operates as a mere continuation of the business of Transtate I, made up of the same employees, Transtate II continues to use the means and methods of Transtate I, including circumventing the access controls to gain access to the USB drive, then used Transtate's software exploit to modify Philips' proprietary software to circumvent access controls and gain unauthorized access to Philips Proprietary Service Materials on Systems that they were not authorized to access (the "exploit process").

133.   Specifically, evidence of the same exploit process, using the misappropriated trade secret information, to infiltrate and gain unauthorized access to Philips Proprietary Service Materials, was discovered on a system at Emory Saint Joseph's Hospital ("Saint Joseph's") in Atlanta, Georgia in April 2017, after

- 36 -

the Acquisition.  On information and belief, Transtate II used this exploit process at Saint Joseph's.

134.   Additional evidence of the same exploit process, using the misappropriated trade secret information, to infiltrate and gain unauthorized access to Philips Proprietary Service Materials, has been discovered at locations in Palm Springs, California; and Raleigh, North Carolina; all locations where Transtate I (through its employees) had previously used the same exploit process. Accordingly, on information and belief, Transtate II used the same exploit process at each of these identified locations.  At each of these locations the exploit process involved the use of Transtate's software exploit.

135.   Upon information and belief, Transtate II's technicians' modification of Philips' proprietary software to circumvent access controls gave the Transtate II technicians unauthorized access to Philips Proprietary Service Materials on Systems that they were not authorized to access.

136.   Transtate II's employees have admitted that their use of the software exploit provides them access to Philips' proprietary service tools and copyrighted logs that they would not otherwise be able to access using their Philips authorized IST keys.  This use of the software exploit circumvents Philips' access controls, which otherwise would prohibit such access to Philips' Proprietary Service Materials and copyrighted logs and software.

- 37 -

137.   Transate II also transfers, or otherwise disposes of, the software exploit to others.

138.   Specifically, Transate II provided an employee of Pacific Medical with its software exploit to allow him to disable a Philips security feature in Philips' Allura systems.

139.   William Griswold instructed the Pacific Medical employee on how to access Philips' proprietary service tools using the software exploit provided to him by Transate II.

140.   Transate II has also distributed the log file downloader software to third parties and trained those third parties to use the log file downloader software to gain access to Philips' copyrighted log files and software and provide unauthorized copies of those copyrighted logs to Transate.

141.   Access to, and use of, Philips' proprietary data and Philips' trade secrets is of significant commercial value to those that gain improper access to it— like Transate II—because it permits the entity to improperly modify Philips Systems to circumvent access controls and provide maintenance and support services of a type and/or efficiency that—without their improper access—only Philips' service technicians could perform.  Relatedly, protection of Philips' access control information and other such Philips' proprietary data and Philips' trade secrets is of significant commercial value to Philips with respect to Philips'

- 38 -

marketing of support, servicing, and maintenance services to hospitals, medical centers, and other Philips customers.

142.    Upon information and belief, Transtate II's conduct – and the conduct of those working for Transtate II – is not limited in time to the above-identified events and is not limited in geographic location to only the identified sites.  Upon information and belief, Transtate II's conduct is, instead, representative of widespread and on-going conduct.

## Count I:  Violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a) (Transtate I and II)

143.    Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count I.

144.    Transtate I has intentionally and/or knowingly accessed Philips Proprietary Service Materials on the Allura Systems at Lakewood, Holmes, Piedmont, and other locations either without authorization, or in excess of their authorization, and in excess of access that the Systems' owners had the rights and ability to confer upon Transtate I.

145.    Transtate I has accessed and obtained information from the Systems in violation of the CFAA.

146.    Transtate I has impaired the integrity of the Philips' proprietary software on the Systems and the integrity of the systems generally by modifying

software to disable access controls, and thereby allowing unauthorized users to gain unrestricted access to the Systems.

147.   Transtate I has damaged the Systems and Philips' proprietary software on the Systems.

148.   The Systems at-issue are connected to the Internet and affect interstate commerce.  Thus, the Systems are protected computers.

149.   Transtate I has knowingly modified and thereby circumvented the access controls to gain unauthorized access to Philips' proprietary software to provide maintenance or other services.  On information and belief, Transtate I held itself out as being authorized to perform the maintenance and other services and received payment for those services.  Transtate I has thereby knowingly, and with intent to defraud, accessed a protected computer without authorization, and by means of that conduct furthers the intended fraud and obtained value.

150.   Transtate I altered the software to bypass the access controls by knowingly causing the transmission of a program or command that compromised the integrity of the proprietary software by modifying or removing its access controls.  As a result of Transtate I's conduct, Transtate I intentionally caused damage without authorization to a protected computer.

151.   By engaging in the conduct set forth in the preceding paragraphs of this Amended Complaint, Transtate I has caused Philips to incur losses in excess of

$5,000.00 in value in a one-year period related to the investigation of and cost of responding to the conduct.

152.   While the Systems at-issue are, in at least some cases, owned by hospitals that are not parties to this action, Philips has reserved and retained its rights to the Philips Proprietary Service Materials contained on those Systems.

153.   By engaging in the conduct set forth in the preceding paragraphs of this Amended Complaint, Transtate I accessed the Systems without authorization or has exceeded its authorized levels of access to the Systems and Philips' proprietary software, including Proprietary Service Materials, thereby obtaining access to valuable information and proprietary tools and information, in violation of at least 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), (a)(5)(A) and (a)(5)(C).

154.   Transtate II has intentionally and/or knowingly accessed Philips Proprietary Service Materials using Transtate's software exploit and log file downloader on Philips Systems either without authorization, or in excess of their authorization, and in excess of access that the Systems' owners had the rights and ability to confer upon Transtate II.

155.   Transtate II has accessed and obtained information from the Systems in violation of the CFAA.

156.   Transtate II has impaired the integrity of the Philips' proprietary software on the Systems and the integrity of the systems generally by modifying

Active\95542538.v2-5/23/19

software to disable access controls using Transtate's software exploit, and thereby allowing unauthorized users to gain unrestricted access to the Systems.

157.   Transtate II has damaged the Systems and Philips' proprietary software on the Systems.

158.   The Systems at-issue are connected to the Internet and are used in and affect interstate commerce.  Thus, the Systems are protected computers.

159.   Transtate II has knowingly modified and thereby circumvented the access controls to gain unauthorized access to Philips' proprietary software using Transtate's software exploit in order to provide maintenance or other services.  On information and belief, Transtate II held itself out as being authorized to perform the maintenance and other services and received payment for those services. Transtate II has thereby knowingly, and with intent to defraud, accessed a protected computer without authorization, and by means of that conduct furthers the intended fraud and obtained value.

160.   Transtate II's use of the software exploit has altered the software to bypass the access controls by knowingly causing the transmission of a program or command that compromised the integrity of the proprietary software by modifying or removing its access controls.  As a result of Transtate II's conduct, Transtate II intentionally caused damage without authorization to a protected computer.

Active\95542538.v2-5/23/19

161.   By engaging in the conduct set forth in the preceding paragraphs of this Amended Complaint, Transtate II has caused Philips to incur losses in excess of $5,000.00 in value in a one-year period related to the investigation of and cost of responding to the conduct.

162.   While the Systems at-issue are, in at least some cases, owned by hospitals that are not parties to this action, Philips has reserved and retained its rights to the Philips Proprietary Service Materials contained on those Systems.

163.   By engaging in the conduct set forth in the preceding paragraphs of this Amended Complaint, Transtate I and Transtate II have accessed without authorization, or exceeded their authorized levels of access to, the Systems and Philips' proprietary software, thereby obtaining access to valuable and proprietary tools and information, and thereby causing damages to Philips that include business losses.

### Count II:  Violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a)(6) (Transtate II)

164.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count II.

165.   Transtate's software exploit is a software program authored by Transtate specifically meant to facilitate access to Philips Systems by circumventing Philips' access controls without authorization.

Active\95542538.v2-5/23/19

166.   Transtate software exploit has no legally valid use; its application is to facilitate access to Philips Systems by circumventing Philips' access controls without authorization.

167.   Because Transtate's software exploit is specifically meant to facilitate access to Philips Systems by circumventing Philips' access controls without authorization, and because Transtate's software exploit has no legally valid use, Transtate's software exploit is a password or similar information through which a computer may be accessed without authorization.

168.   Transtate's log file downloader is a software program, authored by Transtate, specifically meant to facilitate access to Philips Systems to copy and transmit Philips copyrighted log files by circumventing Philips' access controls without authorization.

169.   Transtate log file downloader has no legally valid use; its application is to facilitate access to Philips Systems to copy and transmit Philips copyrighted log files by circumventing Philips' access controls without authorization.

170.   Because Transtate's log file downloader is specifically meant to facilitate access to Philips Systems by circumventing Philips' access controls without authorization, and because Transtate's log file downloader has no legally valid use, Transtate's log file downloader is a password or similar information through which a computer may be accessed without authorization.

- 44 -

171.    Transtate II has provided copies of Transtate's software exploit to others.  Thus, Transtate II traffics in its software exploit.

172.    Transtate II has provided copies of Transtate's log file downloader to others.  Thus, Transtate II traffics in its log file downloader.

173.    Transtate II trains third parties to make use of its software exploit and its log file downloader in order to copy and transmit Philips' copyrighted log files across the Internet from remote locations.  Thus, Transtate II's behavior affects interstate commerce.

174.    By engaging in the conduct set forth in the preceding paragraphs of this Amended Complaint, Transtate II has and continues to knowingly and with intent to defraud traffic in a password or similar information through which a computer may be accessed without authorization thereby affecting interstate or foreign commerce, in violation of at least 18 U.S.C. §§ 1030(a)(6)(A).

## Count III:  Violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a) (Daniel Wheeler)

175.    Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count III.

176.    Daniel Wheeler was the President of Transtate I until at least sometime in 2018 and was the President of Transtate II until sometime in 2018.

- 45 -

177.   In his capacity as President, Daniel Wheeler oversaw and directly participated in Transtate I and Transtate II's violations of the CFAA.

178.   Daniel Wheeler instructed Transtate employees not to talk with any OEM service representatives about Transtate's methods, which Daniel Wheeler knew were designed to provide Transtate employees with unauthorized access to Philips proprietary software and log files.

179.   Daniel Wheeler further instructed Transtate employees not to allow any non-Transtate personnel to observe the steps Transtate employees took in order to access Philips Proprietary Service Materials.

180.   Because he was an officer of Transtate I and II, and because he oversaw and directly participated in both Transtate I and II's tortious behavior, Daniel Wheeler, through the Estate, is personally liable for Transtate I and II's violations of the CFAA.

181.   Daniel Wheeler's personal participation in Transtate I and II's behavior was knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

182.   As a result of Daniel Wheeler's participation in Transtate I and II's CFAA violations, Philips has suffered actual damages in an amount to be proven at trial.

- 46 -

183.   Philips has been damaged by all of the foregoing and is entitled to an award of damages, including business losses.

## Count IV:  Violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a) (Robert A. ("Andy") Wheeler)

184.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count IV.

185.   Andy Wheeler is the Vice-President of Transtate I and took over as the President of Transtate II from Daniel Wheeler sometime in 2018.

186.   As the Vice-President of Transtate I and President of Transtate II, Andy Wheeler oversaw and directly participated in Transtate I and Transtate II's violations of the CFAA.

187.   Specifically, Andy Wheeler developed a software exploit that impaired the integrity of the system by modifying software to disable access controls and provide unauthorized access to Philips' proprietary software and proprietary logs.

188.   Andy Wheeler has also personally trained and assisted Transtate employees in making use of the software exploit in order to gain unauthorized access to Philips' proprietary software and proprietary logs.

189.   Because he is an officer of both Transtate I and II, and because he oversaw and directly participated in both Transtate I and II's tortious behavior, Andy Wheeler is personally liable for Transtate I and II's violations of the CFAA.

190.   Andy Wheeler's personal participation in Transtate I and II's activities was and is knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

191.   As a result of Andy Wheeler's participation in Transtate I and II's CFAA violations, Philips has suffered actual damages in an amount to be proven at trial.

192.   Philips has been damaged by all of the foregoing and is entitled to an award of damages, including business losses.

## Count V:  Violations of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201 (Transtate I and II)

193.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count V.

194.   Philips' medical imaging systems include Philips' copyrighted and proprietary software.

195.   Philips' log files on its medical imaging systems are protected by copyright under Title 17.

196.   Philips Internal Software is proprietary software protected by copyright under Title 17.

197.   Philips electronic documentation is protected by copyright under Title 17.

198.   Philips employs numerous technological measures including, but not limited to, its Access Key protection scheme and protocol, in order to protect and control access to and use of its copyrighted proprietary software and/or portions thereof.

199.   Transtate I and II intentionally modified Philips' proprietary software to circumvent a technological measure that controls access to Philips' protected software.  Specifically, Transtate I and II circumvented the access controls to gain access to the USB drive, then used Transtate's software exploit to modify computer files in order to deactivate a requirement for an Access Key to access Philips' proprietary software.  Transtate I and II were thus able to bypass the technological measure and gain unauthorized access to the proprietary software.

200.   Philips' technological measures on the Systems also prevent unauthorized access to Philips' copyrighted log files.  Transtate I and II intentionally circumvent access controls through use of their software exploit and potentially other methods to gain unauthorized access to and copy Philips' copyrighted log files on the Allura systems.

- 49 -

201.   Philips employs technological measures, including but not limited to, its account authorization and IST Key protection scheme and protocol, in order to protect and control access to and use of its copyright protected Philips Internal Software.

202.   Transtate I and II employ the circumvention mechanism in order to bypass or circumvent the requirement for a Philips account and an IST Key to access Philips Internal Software.  Transtate I and II were thus able to bypass the technological measure and in each instance gain repeated unauthorized access to the proprietary copyright protected Philips Internal Software by virtue of such bypass or circumvention.

203.   Philips employs technological measures, including but not limited to, encryption of its proprietary and copyrighted electronic documentation, in order to protect and control access to and use its copyright protected Philips electronic documentation.

204.   Transtate I and II have intentionally modified Philips' encrypted electronic documents by decrypting them in order to make unencrypted copies thereof which Transtate I and II can then distribute.  Transtate I and II were thus able to bypass or circumvent the technological measure in order to gain repeated unauthorized access to Philips copyright protected electronic documentation.

- 50 -

205.   Transate I and II have intentionally and/or knowingly circumvented technological measures that effectively control access to a work or works protected under Title 17, in violation of 17 U.S.C. § 1201(a)(1)(A) of the Digital Millennium Copyright Act.

206.   Transate I and II's unauthorized means of accessing the Systems, including Philips' proprietary software and copyrighted logs, the Philips Internal Software, and Philips electronic documentation has, and does, entail the unauthorized access, copying, and potential alteration of the contents of Philips' copyrighted proprietary software, log files, and electronic documentation.

207.   Philips has been and will continue to be damaged in an amount not presently known with certainty, but that will be proven at trial.

208.   Philips is entitled to the range of relief provided by 17 U.S.C. § 1203, including but not limited to, injunctive relief, compensatory damages or statutory damages, punitive damages, and Philips' costs and attorneys' fees in amounts to be proven at trial.  Transate I and II's conduct also has caused irreparable and incalculable harm and injuries to Philips, and, unless enjoined, will cause further irreparable and incalculable injury, for which Philips has no adequate remedy at law.

## Count VI:  Violations of the Digital Millennium
## Copyright Act (DMCA), 17 U.S.C. § 1202 (Transtate I and II)

209.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count VI.

210.   Philips' electronic documentation is protected by the copyright laws, and Philips owns the copyright in its electronic documentation.

211.   Philips electronic documentation is made available by Philips to authorized users.

212.   Philips grants authorization to access Philips InCenter database, and the files therein, to third parties having registered for AIAT level access.

213.   Philips distributes a wide range of documents through the InCenter database, and controls access to certain electronic documentation by encrypting such documents.  Philips authorized users are authorized to access documentation commensurate with their roles, *i.e.* AIAT level authorization grants access to AIAT level electronic documentation.  Access is facilitated by virtue of Philips IST Keys, such that a user's valid IST Key will enable decryption of files that a user is authorized to access.

214.   Philips electronic documentation includes metadata that may identify the author of the file and that the file originates from Philips, the copyright holder.

215.   Philips electronic documentation's metadata thus includes copyright management information ("CMI") pursuant to 17 U.S.C. § 1202.

216.   Employees of Transtate I and Transtate II download encrypted copies of files that they are not authorized to access, and decrypt those files by making use of Transtate decryption and stripping mechanism.

217.   Transtate I and Transtate II's decryption and stripping mechanism first decrypts Philips electronic documentation without authorization, and then removes the metadata, including CMI, from the unauthorized copies of Philips electronic documentation created and distributed by Transtate.

218.   Employees of Transtate I and Transtate II then distribute such decrypted files stripped of their metadata.

219.   Transtate I and II have intentionally and/or knowingly removed and altered the copyright management information contained in Philips' electronic documentation metadata without the authority of the copyright owner or the law knowing, or having reasonable grounds to know, that such behavior will induce, enable, facilitate, or conceal an infringement of Philips rights under Title 17, in violation of 17 U.S.C. § 1202(b)(1) of the Digital Millennium Copyright Act.

220.   Transtate I and II have intentionally and/or knowingly distributed copyright management information knowing that the copyright management information contained in Philips' electronic documentation metadata has been

- 53 -

removed or altered without the authority of the copyright owner or the law

knowing, or having reasonable grounds to know, that such behavior will induce,

enable, facilitate, or conceal an infringement of Philips rights under Title 17, in

violation of 17 U.S.C. § 1202(b)(2) of the Digital Millennium Copyright Act.

221.   Transtate I and II have intentionally and/or knowingly distributed

copies of Philips' electronic documentation knowing that the copyright

management information contained in Philips' electronic documentation metadata

has been removed or altered without the authority of the copyright owner or the

law knowing, or having reasonable grounds to know, that such behavior will

induce, enable, facilitate, or conceal an infringement of Philips rights under Title

17, in violation of 17 U.S.C. § 1202(b)(3) of the Digital Millennium Copyright

Act.

222.   Philips has been and will continue to be damaged in an amount not

presently known with certainty, but that will be proven at trial.

223.   Philips is entitled to the range of relief provided by 17 U.S.C. § 1203,

including but not limited to, injunctive relief, compensatory damages or statutory

damages, punitive damages, and Philips' costs and attorneys' fees in amounts to be

proven at trial.  Transtate I and II's conduct also has caused irreparable and

incalculable harm and injuries to Philips, and, unless enjoined, will cause further

- 54 -

irreparable and incalculable injury, for which Philips has no adequate remedy at law.

### Count VII:  Violations of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201 and 1202 (Daniel Wheeler)

224.    Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count VII.

225.    Daniel Wheeler was the President of Transtate I until at least sometime in 2018 and was the President of Transtate II until sometime in 2018.

226.    As the President of both Transtate entities, Daniel Wheeler oversaw, and had the right and ability to supervise, Transtate's actions addressed in this complaint, including its use of Exploit Mechanisms to circumvent technological measures that effectively control access to works protected under Title 17, including Philips proprietary software and logs on Philips systems, Philips Internal Software, and Philips' electronic documentation.

227.    Daniel Wheeler was the President and an owner of Transtate I, and was the former President of Transtate II.  Thus, Daniel Wheeler had an obvious and direct financial interest in Transtate's circumvention of technological measures.

228.    Daniel Wheeler had the right and ability to supervise the work of employees of Transtate I and II.

Active\95542538.v2-5/23/19

229.   Because Daniel Wheeler had the right and ability to supervise the circumvention actions of Transtate I and Transtate II, and because Daniel Wheeler has an obvious and direct benefit in the circumvention actions, Daniel Wheeler is vicariously liable for Transtate I's and Transtate II's violations of 17 U.S.C. §§ 1201 and 1202.

230.   In addition, or in the alternative, as an officer of Transtate I and II Daniel Wheeler is liable for their torts.

231.   Specifically, in his capacity of President, Daniel Wheeler oversaw and directly participated in Transtate I and Transtate II's circumvention actions to gain access to copyrighted materials.

232.   Specifically, Daniel Wheeler was aware of Transtate's Exploit Mechanisms and oversaw, directed, and participated in Transtate's efforts to conceal its tortious behavior.

233.   Daniel Wheeler instructed Transtate I and II employees to conceal the steps they employed to access Philips Proprietary Service Materials on Philips Systems.

234.   Daniel Wheeler instructed Transtate employees not to talk with any OEM service representatives about Transtate's methods.

Active\95542538.v2-5/23/19

235.   Daniel Wheeler further instructed Transtate employees not to allow any non-Transtate personnel to observe the steps Transtate employees took in order to access Philips Proprietary Service Materials.

236.   Because he was an officer of both Transtate I and II, and because he oversaw and directly participated in both Transtate I and II's tortious behavior, Daniel Wheeler, through the Estate, is personally liable for Transtate I and II's violations of 17 U.S.C. §§ 1201 and 1202.

237.   Philips has been and will continue to be damaged in an amount not presently known with certainty, but that will be proven at trial.

238.   Philips is entitled to the range of relief provided by 17 U.S.C. § 1203, including but not limited to, injunctive relief, compensatory damages or statutory damages, punitive damages, and Philips' costs and attorneys' fees in amounts to be proven at trial.  Transtate I and II's conduct also has caused irreparable and incalculable harm and injuries to Philips, and, unless enjoined, will cause further irreparable and incalculable injury, for which Philips has no adequate remedy at law.

### Count VIII:  Violations of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201 and 1202 (Robert A. Wheeler)

239.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count VIII.

240.   Andy Wheeler is the Vice-President of Transtate I and took over as the President of Transtate II from Daniel Wheeler sometime in 2018.

241.   As the Vice-President of Transtate I and President of Transtate II, Andy Wheeler oversaw, and had the right and ability to supervise, Transtate's actions addressed in this complaint, including its use of Exploit Mechanisms to circumvent technological measures that effectively control access to works protected under Title 17, including Philips proprietary software and logs on Philips systems, Philips Internal Software, and Philips' electronic documentation.

242.   Andy Wheeler developed one or more of the Exploit Mechanisms addressed above, which circumvent technological measures, and thus directly participated Transtate I and Transtate II's circumvention behavior described above.

243.   Andy Wheeler is an owner of Transtate I and II.  Thus, Andy Wheeler had, and continues to have, an obvious and direct financial interest in Transtate's circumvention of technological measures.

244.   Andy Wheeler has, and had, the right and ability to supervise the work of employees of Transtate I and II.

245.   Because Andy Wheeler had the right and ability to supervise the circumvention actions of Transtate I and Transtate II, and because Andy Wheeler benefitted from the circumvention actions, Andy Wheeler is vicariously liable for Transtate I's and Transtate II's violations of 17 U.S.C. §§ 1201 and 1202.

Active\95542538.v2-5/23/19

246.    In addition, or in the alternative, as an officer of Transtate I and II Andy Wheeler is liable for their torts.

247.    Specifically, as the Vice-President of Transtate I and President of Transtate II, Andy Wheeler oversaw and directly participated in Transtate I and Transtate II's acts of circumvention of access controls to gain access to copyrighted materials.

248.    Specifically, Andy Wheeler was aware of, participated in the use of, and in at least one case (the software exploit) created, Transtate's Exploit Mechanisms and oversaw, directed, and participated in Transtate's use of the software exploit.

249.    Andy Wheeler personally made use of Philips' confidential documents from a Philips Former Employee to write the software exploit, which has only one useful purpose, which is to disable access controls on Philips Systems in order to allow Transtate employees to access and create copies of Philips copyrighted Proprietary Service Materials and copyrighted log files.

250.    Andy Wheeler has also personally trained and assisted Transtate employees in making use of the software exploit in order to disable or otherwise circumvent Philips access controls and create copies of Philips copyrighted Proprietary Service Materials and copyrighted log files.

- 59 -

251.   Andy Wheeler has also personally participated in circumventing Philips access controls and creating copies of Philips Proprietary Service Materials and copyrighted log files.

252.   Philips has been and will continue to be damaged in an amount not presently known with certainty, but that will be proven at trial.

253.   Philips is entitled to the range of relief provided by 17 U.S.C. § 1203, including but not limited to, injunctive relief, compensatory damages or statutory damages, punitive damages, and Philips' costs and attorneys' fees in amounts to be proven at trial.  Transtate I and II's conduct also has caused irreparable and incalculable harm and injuries to Philips, and, unless enjoined, will cause further irreparable and incalculable injury, for which Philips has no adequate remedy at law.

<u>Count IX:  Violations of the Defend<br>Trade Secrets Act (DTSA), 18 U.S.C. § 1836 (Transtate I and II)</u>

254.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count IX.

255.   Philips owns and possesses certain confidential, proprietary, and trade secret information, including scientific, technical, and engineering information and financial, business, and economic information, as alleged above and below, in Philips' proprietary software for the Allura System and other Philips Systems,

- 60 -

including its Field Service Framework access control software on the Allura System.

256.   Philips' confidential, proprietary, and trade secret information relates to products used in, or intended for use in, interstate or foreign commerce.

257.   Philips' proprietary software and access control systems, including the Field Service Framework, contain and are trade secrets because Philips restricts access to them and Philips has engaged in reasonable measures to maintain their secrecy.  Such reasonable measures to protect its trade secrets include, for example, implementing systems of access registration, access control measures, and other safeguards associated with Philips' proprietary software, including in the form of physical and/or technological safeguards and also including in the form of contractual protections and written notices and warnings.

258.   Philips has expended significant money and effort in developing Philips' proprietary software and access control systems, and the information would be difficult to properly acquire or duplicate by Transtate I and II or other competitors of Philips.

259.   Philips' proprietary software and access control systems derive independent economic value to Philips by not being generally known, and not being readily ascertainable through proper means, by another person who could obtain economic value from the disclosure or use of the information.  Moreover,

Active\95542538.v2-5/23/19

they are of significant commercial value to Philips, because among other things, Philips relies upon these trade secrets to achieve an advantage in the marketplace with respect to the quality, range, and efficiency of the repair and maintenance services that it is able to offer and with respect to pricing related thereto. Further, Philips relies on its trade secret proprietary software and access control systems to protect the public from potential unnecessary radiation exposure as a result of modification or customization of the systems by unauthorized or insufficiently trained users.

260.   Additional examples of trade secret information misappropriated by Transtate I and II include: information regarding how to locally and remotely access Philips' systems; Philips' internal documentation about software Philips uses for information gathering and multi-user collaboration; internal Philips' plans for production and end of life of its systems; Philips' internal customer information; Philips' internal stand-alone software programs; and passwords. Philips' takes reasonable steps to protect such information, through both confidentiality obligations with its employees and technological measures. Such trade secret information provides independent economic value by not being generally known because they allow Philips' to secure its systems and grow its relationships with its customers.

261.   Transtate I and II misappropriated some or all of these trade secrets for its own unlawful use and/or benefit without express or implied consent by Philips.  At the time of its use of such trade secrets, Transtate I and II knew or had reason to know that its knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, and that its knowledge of Philips' trade secrets was derived from or through a person who owed a duty to Philips to maintain the secrecy of the trade secret or limit the use of the trade secret.

262.   Transtate I and II's actions have been knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

263.   As a result of Transtate I and II's misappropriation of these trade secrets, Philips has suffered actual damages in an amount to be proven at trial.  At a minimum, Transtate I and II have gained an improper competitive advantage over Philips that caused or may cause Philips to be underbid or to otherwise lose out on business that it would have otherwise obtained.

264.   Transtate I and II's conduct, and Transtate II's ongoing and continuing use of the trade secrets and proprietary and confidential information of Philips, has caused, and will cause, Philips repeated and irreparable injury. Philips' remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Transtate I and II.

- 63 -

265.   Philips has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

266.   By engaging in the conduct set forth in the preceding paragraphs of this Amended Complaint, Transtate I and II have violated the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836.

**Count X:  Violations of the Defend**
**Trade Secrets Act (DTSA), 18 U.S.C. § 1836 (Daniel Wheeler)**

267.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count X.

268.   Daniel Wheeler was the President of Transtate I until at least sometime in 2018 and was the President of Transtate II until sometime in 2018.

269.   In his capacity as President, Daniel Wheeler oversaw and directly participated in Transtate I and Transtate II's behavior in violation of 18 U.S.C. 1836.

270.   Specifically, Daniel Wheeler was aware of Transtate's Exploit Mechanisms and oversaw, directed, and participated in Transtate's efforts to conceal its tortious behavior.

271.   Daniel Wheeler instructed Transtate I and II employees to conceal the steps they employed to access Philips Proprietary Service Materials on Philips Systems.

- 64 -

272.   Daniel Wheeler instructed Transtate employees not to talk with any OEM service representatives about Transtate's methods.

273.   Daniel Wheeler further instructed Transtate employees not to allow any non-Transtate personnel observe the steps Transtate employees took in order to access Philips Proprietary Service Materials.

274.   Because he was an officer of both Transtate I and II, and because he oversaw and directly participated in both Transtate I and II's tortious behavior, Daniel Wheeler, through the Estate, is personally liable for Transtate I and II's behavior in violation of 18 U.S.C. § 1836.

275.   Daniel Wheeler's personal participation in Transtate I and II's behavior was knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

276.   As a result of Daniel Wheeler's participation in Transtate I and II's misappropriation of Philips' trade secrets, Philips has suffered actual damages in an amount to be proven at trial.  At a minimum, through Daniel Wheeler's activities, Transtate I and II have gained an improper competitive advantage over Philips that caused or may cause Philips to be underbid or to otherwise lose out on business that it would have otherwise obtained.

277.   Daniel Wheeler's participation in Transtate I and II's conduct, and Transtate II's ongoing and continuing use of the trade secrets and proprietary and

confidential information of Philips, has caused, and will cause, Philips repeated and irreparable injury.  Philips' remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Transtate I and II.

278.   Philips has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## Count XI:  Violations of the Defend
## Trade Secrets Act (DTSA), 18 U.S.C. § 1836 (Robert A. Wheeler)

279.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count XI.

280.   Andy Wheeler is the Vice-President of Transtate I and took over as the President of Transtate II from Daniel Wheeler sometime in 2018.

281.   As the Vice-President of Transtate I and President of Transtate II, Andy Wheeler oversaw and directly participated in Transtate I and Transtate II's behavior in violation of 18 U.S.C. 1836.

282.   Specifically, Andy Wheeler was aware of, participated in the use of, and in at least one case (the software exploit) created, Transtate's Exploit Mechanisms and oversaw, directed, and participated in Transtate's efforts to conceal its tortious behavior.

283.    Andy Wheeler personally made use of Philips' confidential documents from a Philips Former Employee to write the software exploit, which has only one useful purpose, which is to disable access controls on Philips Systems in order to allow Transtate employees to access Philips Proprietary Service Materials and copyrighted log files.

284.    Andy Wheeler has also personally trained and assisted Transtate employees in making use of the software exploit in order to disable or otherwise circumvent Philips access controls.

285.    Andy Wheeler has also personally participated in circumventing and disabling Philips access controls on Philips Systems.

286.    Because he is an officer of both Transtate I and II, and because he oversaw and directly participated in both Transtate I and II's tortious behavior, Andy Wheeler is personally liable for Transtate I and II's behavior in violation of 18 U.S.C. § 1836.

287.    Andy Wheeler's personal participation in Transtate I and II's activities was and is knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

288.    As a result of Andy Wheeler's participation in Transtate I and II's misappropriation of Philips' trade secrets, Philips has suffered actual damages in an amount to be proven at trial.  At a minimum, through Andy Wheeler's activities,

- 67 -

Transtate I and II have gained an improper competitive advantage over Philips that caused or may cause Philips to be underbid or to otherwise lose out on business that it would have otherwise obtained.

289.   Andy Wheeler's participation in Transtate I and II's conduct, and Transtate II's ongoing and continuing use of the trade secrets and proprietary and confidential information of Philips, has caused, and will cause, Philips repeated and irreparable injury.  Philips' remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Transtate I and II.

290.   Philips has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## Count XII:  Misappropriation of Trade Secrets and Violation of the Georgia Trade Secrets Act, O.C.G.A § 10-1-760, *et seq.* (Transtate I and II)

291.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count XII.

292.   Philips owns and possesses certain confidential, proprietary, and trade secret information, including scientific, technical, and engineering information and financial, business, and economic information, as alleged above and below, in Philips' proprietary software for the Allura System and other Philips Systems,

including its Field Service Framework access control software on the Allura System.

293.   Philips' proprietary software and access control systems, including the Field Service Framework, contain and are trade secrets because Philips restricts access to them and Philips has engaged in reasonable measures to maintain their secrecy.  Such reasonable measures to protect its trade secrets include, for example, implementing systems of access registration, access control measures, and other safeguards associated with Philips' proprietary software, including in the form of physical and/or technological safeguards and also including in the form of contractual protections and written notices and warnings.

294.   Philips has expended significant money and effort in developing Philips' proprietary software and access control systems, and the information would be difficult to properly acquire or duplicate by Transtate I or II or other competitors of Philips.

295.   Philips' proprietary software and access control systems derive independent economic value to Philips by not being generally known, and not being readily ascertainable through proper means, by another person who could obtain economic value from the disclosure or use of the information.  Moreover, they are of significant commercial value to Philips, because among other things, Philips relies upon these trade secrets to achieve an advantage in the marketplace

with respect to the quality, range, and efficiency of the repair and maintenance services that it is able to offer and with respect to pricing related thereto.  Further, Philips relies on its trade secret proprietary software and access control systems to protect the public from potential unnecessary radiation exposure as a result of modification or customization of the systems by unauthorized or insufficiently trained users.

296.   Additional examples of trade secret information misappropriated by Transtate I and II include: information regarding how to locally and remotely access Philips' systems: Philips' internal documentation about software Philips uses for information gathering and multi-user collaboration; internal Philips' plans for production and end of life of its systems; Philips' internal customer information; Philips' internal stand-alone software programs; and passwords. Philips' takes reasonable steps to protect such information, through both confidentiality obligations with its employees and technological measures.  Such trade secret information provides independent economic value by not being generally known because they allow Philips' to secure its systems and grow its relationships with its customers.

297.   Transtate I and II misappropriated some or all of these trade secrets for its own unlawful use and/or benefit without express or implied consent by Philips.  At the time of its use of such trade secrets, Transtate I and II knew or had

- 70 -

reason to know that its knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, and that its knowledge of Philips' trade secrets was derived from or through a person who owed a duty to Philips to maintain the secrecy of the trade secret or limit the use of the trade secret.

298.   Transtate I and II's actions have been knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

299.   As a result of Transtate I and II's misappropriation of these trade secrets, Philips has suffered actual damages in an amount to be proven at trial.   At a minimum, Transtate I and II have gained an improper competitive advantage over Philips that caused or may cause Philips to be underbid or to otherwise lose out on business that it would have otherwise obtained.

300.   Transtate I and II's conduct, and Transtate II's ongoing and continuing use of the trade secrets and proprietary and confidential information of Philips, has caused, and will cause, Philips repeated and irreparable injury. Philips' remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Transtate I and II.

301.   Philips has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

302.   By engaging in the conduct set forth in the preceding paragraphs of this Amended Complaint, Transtate I and II have misappropriated trade secrets and has violated state trade secrets acts, including the Georgia Trade Secrets Act, O.C.G.A § 10-1-760, *et seq*.

### Count XIII:  Misappropriation of Trade Secrets and Violation of the Georgia Trade Secrets Act, O.C.G.A § 10-1-760, *et seq*. (Daniel Wheeler and Robert A. Wheeler)

303.  Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count XIII.

304.   For all the same reasons that Daniel Wheeler, through the Estate, and Robert A. Wheeler are personally liable for Transtate I and Transtate II's violations of 18 U.S.C. § 1836 as set forth above, Daniel Wheeler, through the Estate, and Robert A. Wheeler are also personally liable for Transtate I and II's misappropriation of Philips' trade secrets and therefore have violated state trade secrets acts, including the Georgia Trade Secrets Act, O.C.G.A § 10-1-760, *et seq*.

### Count XIV:  Copyright Infringement (Transtate I and II)

305.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count XIV.

Active\95542538.v2-5/23/19

306.   Philips' proprietary software is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101, *et seq.*

307.   Philips has complied in all respects with the provisions of the Copyright Act, and has registered the copyright in the Philips' proprietary software for the Allura System with the United States Copyright Office.  Copies of the Certificates of Registration are attached hereto as Exhibit A, and are fully incorporated into this Amended Complaint as if set forth in full herein.

308.   Philips is the developer and owner of all rights, title, and interest in and to the copyright on the Philips Proprietary Service Materials for the Allura System.

309.   Transtate I and II engaged in copyright infringement by, without authorization, creating a copy of configuration files on the Allura System and by modifying the configuration files to create derivative works.

310.   Transtate I and II further engaged in copyright infringement by creating copies of Philips Proprietary Service Materials in the memory of the Allura Systems by its unauthorized use of the software.

311.   Transtate I and II further engaged in copyright infringement by, without authorization, creating copies of copyrighted log files.

312.   Transtate I and II's acts constitute direct and/or contributory infringement of Philips' copyrights, including infringement of Philips' copyrights on Philips' proprietary software for the Allura System.

313.   Transtate I and II engaged in copyright infringement by copying, reproducing, distributing, displaying, using, and/or creating unauthorized derivative works of Philips' proprietary software without authorization.

314.   Upon information and belief, these actions on Transtate I and II's part have been knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

315.   Transtate I and II's copyright infringement has caused, and Transtate II's infringement will continue to cause, Philips to suffer substantial injuries, loss, and damage to its proprietary and exclusive rights to, and copyright in, Philips' proprietary software and, further, has damaged Philips' business, reputation and goodwill, diverted its trade, and caused a loss of profits, all in amounts not yet ascertained.

316.   Transtate I and II's copyright infringement, and the threat of continuing infringement, has caused, and will continue to cause, Philips repeated and irreparable injury.  It is, at present, difficult to ascertain the amount of damages that would afford Philips adequate relief at law for Transtate I's past and Transtate II's continuing acts.  Philips' remedy at law is not, by itself, adequate to

- 74 -

compensate it for the injuries already inflicted and further threatened by Transtate I and II.

### Count XV:  Copyright Infringement (Daniel Wheeler)

317.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count XV.

318.   Daniel Wheeler was the President of Transtate I until at least sometime in 2018 and was the President of Transtate II until sometime in 2018.

319.   As the President of both Transtate entities, Daniel Wheeler oversaw, and had the right and ability to supervise, Transtate's actions addressed in this complaint, including Transtate I's and Transtate II's infringement of Philips' copyrighted works.

320.   Daniel Wheeler was the President and owner of Transtate I, and was the former President of Transtate II.  Thus, Daniel Wheeler had an obvious and direct financial interest in Transtate's copyright infringement.

321.   Daniel Wheeler had the right and ability to supervise the work of employees of Transtate I and Transtate II.

322.   Because Daniel Wheeler had the right and ability to supervise the copyright infringement actions of Transtate I and II, and because Daniel Wheeler has an obvious and direct benefit in the copyright infringement, Daniel Wheeler,

Active\95542538.v2-5/23/19

through the Estate, is vicariously liable for Transtate I's and Transtate II's violations of Philips rights under the Copyright Act, 17 U.S.C. § 101, *et seq.*

323.   In addition, or in the alternative, as an officer of Transtate I and II Daniel Wheeler, through the Estate, is liable for their torts.

324.   In his capacity of President, Daniel Wheeler oversaw and directly participated in Transtate I and Transtate II's copyright infringement.

325.   Specifically, Daniel Wheeler was aware of Transtate's Exploit Mechanisms and oversaw, directed, and participated in Transtate's efforts to conceal its tortious behavior.

326.   Daniel Wheeler instructed Transtate I and II employees to conceal the steps they employed to access Philips Proprietary Service Materials on Philips Systems.

327.   Daniel Wheeler instructed Transtate employees not to talk with any OEM service representatives about Transtate's methods.

328.   Daniel Wheeler further instructed Transtate employees not to allow any non-Transtate personnel to observe the steps Transtate employees took in order to access Philips Proprietary Service Materials.

329.   Because he was an officer of both Transtate I and II, and because he oversaw and directly participated in both Transtate I and II's tortious behavior,

Daniel Wheeler, through the Estate, is personally liable for Transtate I and II's copyright infringement.

330.   Philips has been and will continue to be damaged in an amount not presently known with certainty, but that will be proven at trial.

331.   Upon information and belief, these actions of Daniel Wheeler have been knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

332.   Daniel Wheeler's and Transtate I and II's copyright infringement has caused Philips to suffer substantial injuries, loss, and damage to its proprietary and exclusive rights to, and copyright in, Philips' proprietary software and, further, has damaged Philips' business, reputation and goodwill, diverted its trade, and caused a loss of profits, all in amounts not yet ascertained.

333.   Daniel Wheeler's and Transtate I and II's copyright infringement, and the threat of continuing infringement, has caused, and will continue to cause, Philips repeated and irreparable injury.  It is, at present, difficult to ascertain the amount of damages that would afford Philips adequate relief at law for Daniel Wheeler's and Transtate I's past and Transtate II's past acts.  Philips' remedy at law is not, by itself, adequate to compensate it for the injuries already inflicted and further threatened by Daniel Wheeler and Transtate I and II.

Active\95542538.v2-5/23/19

### Count XVI:  Copyright Infringement (Robert A. Wheeler)

334.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count XVI.

335.   Andy Wheeler is the Vice-President of Transtate I and took over as the President of Transtate II from Daniel Wheeler sometime in 2018.

336.   As the Vice-President of Transtate I and President of Transtate II, Andy Wheeler oversaw, and had, and has the right and ability to supervise, Transtate's actions addressed in this complaint, including Transtate I's and Transtate II's infringement of Philips' copyrighted works.

337.   Andy Wheeler is an owner of Transtate I and II.  Thus, Andy Wheeler had, and continues to have, an obvious and direct financial interest in Transtate's copyright infringement.

338.   Andy Wheeler has, and had, the right and ability to supervise the work of employees of Transtate I and II.

339.   Because Andy Wheeler had the right and ability to supervise the copyright infringement actions of Transtate I and Transtate II, and because Andy Wheeler has an obvious and direct benefit in the copyright infringement, Andy Wheeler is vicariously liable for Transtate I's and Transtate violations of Philips rights under the Copyright Act, 17 U.S.C. § 101, *et seq.*

Active\95542538.v2-5/23/19

340.   In addition, or in the alternative, as an officer of Transtate I and II Andy Wheeler is liable for their torts.

341.   As the Vice-President of Transtate I and President of Transtate II, Andy Wheeler oversaw and directly participated in Transtate I and Transtate II's acts of copyright infringement.

342.   Specifically, Andy Wheeler was aware of, participated in the use of, and in at least one case (the software exploit) created, Transtate's Exploit Mechanisms and oversaw, directed, and participated in Transtate's efforts to conceal its tortious behavior.

343.   Andy Wheeler personally made use of Philips' confidential documents from a Philips Former Employee to write the software exploit, which has only one useful purpose, which is to disable access controls on Philips Systems in order to allow Transtate employees to access and create copies of Philips copyrighted Proprietary Service Materials and copyrighted log files.

344.   Andy Wheeler has also personally trained and assisted Transtate employees in making use of the software exploit in order to disable or otherwise circumvent Philips access controls and create copies of Philips copyrighted Proprietary Service Materials and copyrighted log files.

345.   Andy Wheeler has also personally participated in creating copies of Philips Proprietary Service Materials and copyrighted log files.

346.   Philips has been and will continue to be damaged in an amount not presently known with certainty, but that will be proven at trial.

347.   Upon information and belief, these actions of Andy Wheeler have been knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

348.   Andy Wheeler's and Transtate I and II's copyright infringement has caused, and continues to cause, Philips to suffer substantial injuries, loss, and damage to its proprietary and exclusive rights to, and copyright in, Philips' proprietary software and documentation and, further, has damaged Philips' business, reputation and goodwill, diverted its trade, and caused a loss of profits, all in amounts not yet ascertained.

349.   Andy Wheeler's and Transtate I and II's copyright infringement, and the threat of continuing infringement, has caused, and will continue to cause, Philips repeated and irreparable injury.  It is, at present, difficult to ascertain the amount of damages that would afford Philips adequate relief at law for Andy Wheeler's and Transtate I's past and Transtate II's past and ongoing acts.  Philips' remedy at law is not, by itself, adequate to compensate it for the injuries already inflicted and further threatened by Andy Wheeler and Transtate I and II.

## Count XVII:  Tortious Interference with Contractual Relations
## (Transtate I and II)

350.   Philips reasserts, re-alleges, and incorporates by reference the

allegations in all other paragraphs of this Complaint as if fully set forth herein

under Count XVII.

351.   Philips employees enter into contractual agreements with Philips as a

condition of their employment.  Specifically, Philips employees enter into

Employee Ethics and Intellectual Property Agreements ("IP Agreements") with

Philips.

352.   Pursuant to the IP Agreements, Philips employees covenant not to use,

publish, or otherwise disclose (except as their job requires) secret or confidential

(proprietary) information or data.

353.   Pursuant to the IP Agreements, Philips employees further covenant to,

upon termination, deliver promptly all written and other materials that relate to

Philips' business.

354.   Philips' Employee Ethics and Confidentiality Agreement is publicly

available at page 41 of Philips' Simply Right book, which is available to anyone

over the Internet.

355.   Transtate I and II have elicited Philips' secret and confidential

information and data, and Philips' proprietary documents and material, from

Former Philips Employees and others with confidentiality obligations to Philips.

- 81 -

356.   Transtate I and II have further induced Former Philips Employees and others to share such Philips' secret and confidential information and data and proprietary documents and material with Transtate I and II.  Such documents included detailed means of accessing Philips Systems locally and remotely, and such information included confidential passwords and confidential business information.

357.   Transtate I and II intended to receive such information in order to exploit the information for at least the purposes of developing Transtate's Exploit Mechanisms and to otherwise gain unauthorized access to Philips Systems, Philips Internal Software, and Philips' encrypted documents.

358.   Transtate I and II did receive such information and did exploit it for at least the purposes of developing Transtate Exploit Mechanisms.

359.   Transtate I and II have also caused its employees to make use of Transtate's Exploit Mechanisms and Philips' secret and confidential information to access Philips Proprietary Service Material, Philips Internal Software, and/or Philips' encrypted documents and for the benefit of its service and parts business.

360.   Transtate I and II have caused and continue to cause Former Philips Employees and others to breach material covenants of their IP Agreements with Philips by causing Former Philips Employees and others to share Philips confidential and proprietary material, and to make use of Transtate's Exploit

Mechanisms derived from those trade secrets in order to access Philips confidential and proprietary information, also in violation of material covenants of their IP Agreements with Philips.

361.   Transtate I and II are strangers to Philips IP Agreements with Former Philips Employees and others, because no Transtate party is a party to the IP Agreements, derives benefit from the contracts, or has a valid interest in the IP Agreements. Thus, Transtate I and II's activities are without privilege.

362.   Transtate I and II have knowledge of Philips rights under the IP Agreements, because Philips publicly publishes its IP Agreements, and numerous Transtate employees are Former Philips Employees. Furthermore, it is well known within the medical device service industry that Former Philips Employees are subject to post employment covenants intended to safeguard Philips intellectual property and Transtate itself has confidentiality agreements with its employees and/or contractors.

363.   Transtate I and II have acted intentionally and with malice to injure Philips by seeking out and inducing Former Philips Employees and others to disclose Philips trade secret, confidential, and proprietary information, and causing Former Philips employees to make use of such information in competition against Philips.

Active\95542538.v2-5/23/19

364.   Transtate I and II have also intentionally and with malice developed software exploits based on Philips' trade secret, confidential and proprietary information obtained by causing Former Philips Employees to violate their material covenants under the IP Agreements.  These software exploits further allow Transtate to access, obtain, and operationalize additional Philips proprietary, confidential and trade secret information in direct competition with Philips.

365.   Furthermore, Transtate's distribution of its Exploit Mechanisms, derived from Philips trade secret, confidential, and proprietary material, is unlawful in violation of at least the CFAA, the DMCA, and the copyright laws generally, and thus create a presumption that Transtate I and II's actions intended to injure Philips.

366.   Transtate's conduct towards Former Philips Employees and others, including causing Former Philips Employees to breach their IP Agreements with Philips, was and remains a proximate cause of harm to Philips.  Transtate's activities have allowed Transtate to unfairly compete against Philips by using Philips' own proprietary service tools to increase Transtate's service business. And by inducing Former Philips Employees to use Philips' trade secret, confidential, and proprietary information, Transtate also unfairly profits through its parts sales business driven by its maintenance services.

367.   By engaging in the conduct set forth in the preceding paragraphs of this Amended Complaint, Transtate I and II have engaged in tortious interference with Philips' contractual relations.

368.   Transtate I and II's conduct, and Transtate II's ongoing and continuing conduct, has caused, and will cause, Philips repeated and irreparable injury.  Philips' remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Transtate I and II.

369.   Philips has been damaged by all of the foregoing and is entitled to an award of exemplary damages, punitive damages, and attorneys' fees.

### Count VIII:  Tortious Interference with Contractual Relations (Daniel Wheeler)

370.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Amended Complaint as if fully set forth herein under Count XVIII.

371.   Daniel Wheeler was the President of Transtate I until at least sometime in 2018 and was the President of Transtate II until sometime in 2018.

372.   In his capacity as President, Daniel Wheeler oversaw and directly participated in Transtate I and Transtate II's tortious interference with Philips' contractual relations with Former Philips Employees.

373.   Specifically, Daniel Wheeler was aware of Transtate's tortious behavior and participated in Transtate's efforts to conceal its tortious behavior.

- 85 -

374.   Daniel Wheeler instructed Transtate employees not to talk with any OEM service representatives about Transtate's methods, which Daniel Wheeler knew were derived from information obtained by inducing Former Philips Employees to breach their IP Agreements with Philips.

375.   Daniel Wheeler further instructed Transtate employees not to allow any non-Transtate personnel to observe the steps Transtate employees took in order to access Philips Proprietary Service Materials.

376.   Because he is an officer of Transtate I and former officer of Transtate II, and because he oversaw and directly participated in both Transtate I and II's tortious behavior, Daniel Wheeler, through the Estate, is personally liable for Transtate I and II's tortious interference.

377.   Daniel Wheeler's personal participation in Transtate I and II's behavior was knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

378.   As a result of Daniel Wheeler's participation in Transtate I and II's tortious interference, Philips has suffered actual damages in an amount to be proven at trial.

379.   Philips has been damaged by all of the foregoing and is entitled to an award of exemplary damages, punitive damages, and attorneys' fees.

## Count XIX:  Tortious Interference with Contractual Relations
## (Robert A. ("Andy") Wheeler)

380.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count XIX.

381.   Andy Wheeler is the Vice-President of Transtate I and took over as the President of Transtate II from Daniel Wheeler sometime in 2018.

382.   As the Vice-President of Transtate I and President of Transtate II, Andy Wheeler oversaw and directly participated in Transtate I and Transtate II's Tortious Interference with Philips' contractual relations with Former Philips Employees.

383.   Specifically, Andy Wheeler solicited trade secret, confidential, and/or proprietary Philips material from Former Philips Employees, and made intentional use of that material on behalf of Transtate I and II.

384.   Andy Wheeler has also personally trained and assisted Transtate employees in making use of the software exploit in order to disable or otherwise circumvent Philips access controls.

385.   Andy Wheeler participated in Transtate's efforts to conceal its tortious behavior.

386.   Because he is an officer of both Transtate I and II, and because he oversaw and directly participated in both Transtate I and II's tortious behavior,

- 87 -

Andy Wheeler is personally liable for Transtate I and II's tortious interference with Philips contractual rights pursuant the IP Agreements with Former Philips Employees.

387.   Andy Wheeler's personal participation in Transtate I and II's activities was and is knowing, deliberate, willful, reckless, and in utter disregard of Philips' rights.

388.   As a result of Andy Wheeler's participation in Transtate I and II's tortious interference, Philips has suffered actual damages in an amount to be proven at trial.

389.   Philips has been damaged by all of the foregoing and is entitled to an award of exemplary damages, punitive damages, and attorneys' fees.

**Count XX:  Attorney's Fees and Expenses of Litigation
Under O.C.G.A. § 13-6-11 (All Defendants)**

390.   Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count XX.

391.   Defendants have acted in bad faith, been stubbornly litigious, and caused Philips unnecessary trouble and expense by intentionally misappropriating Philips' intellectual property, refusing to comply with Philips' cease and desist letters, and intentionally causing damages to Philips' business.

Active\95542538.v2-5/23/19

392.   Accordingly, Philips is entitled to recover its attorney's fees and expenses of litigation from Defendants pursuant to O.C.G.A. § 13-6-11 in an amount to be proven at trial.

## Jury Trial Demanded

393.   Philips hereby requests a jury trial on all issues and claims contained herein that are eligible for trial by jury.

## Prayer for Relief

WHEREFORE, Philips respectfully request that this Court:

A.     enter a permanent injunction consistent with Philips' request herein;

B.     enter a final order in Philips' favor, and holding Defendants liable, for the claims set forth herein;

C.     award monetary damages to Philips, including but not limited to compensatory damages and statutory, enhanced, and punitive damages, to the extent recoverable by law;

D.     award Philips its attorneys' fees and costs under O.C.G.A. § 13-6-11, and otherwise to the extent recoverable by law; and

E.     award Philips any other damages and/or relief deemed appropriate by the Court.

By: /s/ *Dorothy H. Cornwell*
Dorothy H. Cornwell
Georgia State Bar No. 552635

*Counsel for Plaintiffs*

FOX ROTHSCHILD LLP
1180 W Peachtree Street NW, Suite 2300
Atlanta, GA 30309
(404) 962-1096 Telephone
(404) 962-1200 Fax
*DCornwell@foxrothschild.com*

Kirsten R. Rydstrom
Pa. ID 76549 (admitted *pro hac vice*)
Christopher R. Brennan
Pa. ID 313534 (admitted *pro hac vice*)
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Tel.: (412) 288-3131
Fax: (412) 288-3063
Email: krydstrom@reedsmith.com

Gerard M. Donovan
DC Bar 997156 (admitted *pro hac vice*)
REED SMITH LLP
1301 K Street, N.W., Suite 1000 – East Tower
Washington, DC 20005
Tel.: (202) 414-9224
Fax: (202) 414-9299
Email: gdonovan@reedsmith.com

*Counsel for Plaintiffs*

Dated: May 23, 2019

Active\95542538.v2-5/23/19

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 5.1C, NDGa., the foregoing pleading was prepared in

Times New Roman, 14 point font, and was filed electronically with the Clerk of

Court using the CM/ECF system, which will automatically send e-mail notification

of such filing to the following attorney of record:

>Henry R. Chalmers
>Scott. E Taylor
>Megan P. Mitchell
>ARNALL GOLDEN GREGORY LLP
>171 17th Street, NW, Suite 2100
>Atlanta, GA 30363-1031
>*henry.chalmers@agg.com*
>*scott.taylor@agg.com*
>*megan.mitchell@agg.com*
>
>John Christopher Jackson
>John Timothy Kivus
>MORNINGSTAR LAW GROUP
>421 Fayetteville Street
>Raleigh, NC 27601
>*cjackson@morningstarlawgroup.com*
>*jkivus@morningstarlawgroup.com*
>
>*Counsel for Defendants TEC Holdings, Inc., f/k/a Transtate*
>*Equipment Company, Inc., and Transtate Equipment Company, Inc.,*
>*f/k/a Transtate Holdings, Inc*

Dated:  May 23, 2019

>/s/ *Dorothy H. Cornwell*
>Dorothy H. Cornwell

- 91 -